# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
JAN 3 1 2020
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                             DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Black Google Phone
Seized as FP&F No. 2020565600008902 Item 007
("Target Device #3")

)
)
)
)
)
)

Case No.  20MJ0447

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-3

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324 | Transport Illegal Aliens(a)(1)(A)(ii) and (v)(II) |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Giancarlo Lugo, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/31/2020

*Judge's signature*

City and state: San Diego, California

The Honorable Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Giancarlo Lugo, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

> White SKY Phone
> Seized as FP&F No. 2020565600008902 Item 005
> ("**Target Device #1**")
>
> Black Cloud Mobile Phone
> Seized as FP&F No. 2020565600008902 Item 006
> ("**Target Device #2**")
>
> Black Google Phone
> Seized as FP&F No. 2020565600008902 Item 007
> ("**Target Device #3**")
>
> Black Doppio Phone
> Seized as FP&F No. 2020565600008902 Item 008
> ("**Target Device #4**")
>
> White Samsung Phone
> Seized as FP&F No. 2020565600008902 Item 009
> ("**Target Device #5**")
>
> White iPhone
> Seized as FP&F No. 2020565600008902 Item 010
> ("**Target Device #6**")
>
> Black LG Phone
> Seized as FP&F No. 2020565600008902 Item 011
> ("**Target Device #7**")

1

>Black Samsung Phone
>Seized as FP&F No. 2020565600008901 Item 001
>("**Target Device #8**")

the ("**Target Device(s)**"), as further described in Attachment(s) A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8 and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.   The requested warrant(s) relate(s) to the investigation and prosecution of Anthony Joshua MOORE and Ryan Thomas HEARD-Rabon for transportation of illegal aliens within the United States. The **Target Device(s)** is/are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant(s) and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.   I have been employed by the USBP since 2008, and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for ten years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for

2

search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning

3

accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications,

4

photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

   d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

5

## FACTS SUPPORTING PROBABLE CAUSE

11. On January 28, 2020, Border Patrol Agent J. Cameron was conducting anti-smuggling operations in the Boulevard Border Patrol Area of Responsibility. Agent Cameron was wearing full rough duty uniform. Agent Cameron was driving a marked government vehicle equipped with emergency lights and audible police siren.

12. At approximately 8:20 PM, Agent R. Grainger, who was on an elevated position known to Border Patrol agents as "Desert Rose", observing traffic on Old Highway 80 (OH-80) while utilizing a Forward Looking Infra-red (FLIR) night vision to watch an area that suspected illegals were located.

13. At approximately 8:20 PM, Agent Grainger observed a four door sedan driving west on OH-80, near an area known to Border Patrol agents as "Jim Holes", stop in the middle of OH-80. Jim Holes is a tow yard located approximately 100 yards west of Desert Rose on OH-80 and approximately two and a quarter miles north of the United States/Mexico International Boundary. A few seconds later, two individuals emerged from the brush along the north side of OH-80 and ran towards the 4 door sedan and entered the backseat area of the passenger compartment. Agent Grainger relayed his observations via agency radio and stated that the vehicle continued west on OH-80.

14. Agent Cameron responded and was located about one quarter mile west of Jim Hole's on Starship Lane. As the vehicle approached Starship Lane, Agent Cameron observed the Champagne colored Nissan Altima traveling west on OH-80 past his position on Starship Lane. There were no other vehicles traveling on OH-80 at this time. Agent Cameron pulled out on to OH-80 directly behind the champagne colored Nissan Altima.

15. At approximately 8:23 PM, Agent Cameron contacted San Diego Sector Communications via agency radio and advised that he was going to conduct a traffic stop on the champagne colored Nissan Altima in an effort to conduct an immigration inspection on the occupants of the vehicle. Agent Cameron activated his vehicle's emergency lights

6

and sirens, and the driver of the champagne colored Nissan Altima, later identified as the defendant, Anthony Joshua MOORE, yielded on OH-80 at mile marker 29.5. As Agent Cameron approached the vehicle, he observed two individuals laying down across the backseat of the vehicle attempting to conceal themselves. Agent Cameron also observed dirt and brush all over the sweaters and jackets of the two individuals in the backseat. Agent Cameron conducted an immigration inspection on all occupants in the vehicle. MOORE stated that he was a United States citizen. Agent Cameron questioned the front seat passenger, later identified as defendant, Ryan Thomas HEARD-Rabon, as to his immigration status. HEARD stated he was a United States citizen. Agent Cameron then conducted an immigration inspection on the two individuals laying across the backseat of MOORE'S vehicle, later identified as material witnesses, Juan Carlos LANDEROS-Caballero and Ricardo GARCIA-Rosales. Both individuals stated that they are citizens of Mexico without proper immigration documents which would allow them to enter or remain in the United States legally. At approximately 8:29 PM, Agent Cameron placed all four individuals under arrest.

16. A white SKY phone ("**Target Device #1**"), black Cloud mobile phone ("**Target Device #2**"), black Google phone ("**Target Device #3**"), black Doppio phone ("**Target Device #4**"), white Samsung phone ("**Target Device #5**"), white iPhone ("**Target Device #6**"), black LG phone ("**Target Device #7**") and a black Samsung phone ("**Target Device #8**") were discovered in the vehicle on the passenger seat. All eight cell phones ("**Target Device(s)**") were subsequently seized. MOORE was asked who the target devices belonged to. MOORE claimed ownership of the white SKY phone ("**Target Device #1**"), black Cloud mobile phone ("**Target Device #2**"), black Google phone ("**Target Device #3**"), black Doppio phone ("**Target Device #4**"), white Samsung phone ("**Target Device #5**"), white iPhone ("**Target Device #6**"), black LG

7

phone ("**Target Device #7**"). HEARD was asked who the target devices belonged to. HEARD claimed ownership of the black Samsung phone ("**Target Device #8**").

17. HEARD was given an opportunity to provide a statement regarding the event. HEARD stated that on Monday, January 27, 2020, he received a phone call from an individual only known to him as "Joseph". HEARD stated that on that date Joseph recruited him to transport people for a profit of $500.00 and he accepted the offer. HEARD stated that on Tuesday, January 28, 2020, at approximately 10:00 AM, his friend, Anthony MOORE, the driver on the smuggling event, picked him up at his residence in Highland, California. HEARD stated that they both proceeded to a predetermined pick-up location provided by Joseph via text messages. HEARD claims that MOORE received subsequent messages from Joseph, directing them to the pick-up location. HEARD stated they traveled for approximately three hours prior to arriving to the location provided by Joseph. HEARD stated that they waited for a few minutes at this location, when they observed two individuals approach their vehicle and enter the Nissan via the unlocked rear passenger's side door. HEARD claims he asked the two individuals to exit the vehicle but they only spoke Spanish and appeared not to understand. HEARD stated that MOORE proceeded to drive away with the two individuals in the car for approximately three minutes, prior to being arrested. HEARD stated that he had a feeling the two individuals in the car were undocumented illegal aliens.

18. Material witnesses Ricardo GARCIA-Rosales and Juan Carlos LANDEROS-Caballero stated that they are citizens of Mexico without proper immigration documents that would allow them to enter or remain in the United States legally. Both GARCIA and LANDEROS freely admitted to illegally entering the United States with intended destinations of San Fernando, California and Santa Anita, California. GARCIA and LANDEROS admitted to making smuggling arrangements for themselves and were going to pay between $8,000 and $8,500. GARCIA and LANDEROS stated that when their load

8

vehicle arrived, someone inside the vehicle called out their names, which was their sign to enter the vehicle. Once inside the vehicle, both GARCIA and LANDEROS stated that the front seat passenger of the vehicle (HEARD), gestured with his hands for them to lay down. LANDEROS further stated that the front seat passenger (HEARD), threw a blanket on top of them in order to conceal them.

## METHODOLOGY

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the

results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

22. Law enforcement has previously attempted to obtain the evidence sought by this warrant through the owners' consent. Consent was not given.

## CONCLUSION

23. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device(s)** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

24. Because the **Target Device(s)** were seized at the time of MOORE and HEARD's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device(s)**. As stated above, I believe that the appropriate date range for this search is from **December 29, 2019, through January 29, 2020.**

10

25. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item(s) described in Attachment(s) A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Giancarlo Lugo
Border Patrol Agent

Subscribed and sworn to before me this 3̶0̶ᵗʰ 31st day of January, 2020.

Hon. Barbara L. Major
United States Magistrate Judge

11

# ATTACHMENT A-3

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Black Google Phone
Seized as FP&F No. 2020565600008902 Item 007
(**"Target Device #3"**)

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone(s) described in Attachment(s) A-1, A-2, A-3, A-4, A-5, A-6, A-7 and A-8 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone(s) for evidence described below. The seizure and search of the cellular telephone(s) shall follow the search methodology described in the affidavit submitted in support of the warrant(s).

The evidence to be seized from the cellular telephone(s) will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 29, 2019 to January 29, 2020:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

     f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.